AO 102 (01/09)  Application for a Tracking Warrant

# UNITED STATES DISTRICT COURT

for the
Southern District of Ohio

FILED
RICHARD W. NAGEL
CLERK OF COURT

12/29/23

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
WEST. DIV. DAYTON

In the Matter of the Tracking of
*(Identify the person to be tracked or describe*
*the object or property to be used for tracking)*
A Red 2016 Kia Forte, Bearing Ohio
License Plate Number JSS2994
VIN # KNAFX4A68G5554896

)
)
)
)
)
)

Case No.    3:23-MJ-569

## APPLICATION FOR A TRACKING WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or attorney for the government, have reason to believe that the person, property, or object described above has been and likely will continue to be involved in one or more violations of

_21_ U.S.C. § _841(a)(1) & 846_ . Therefore, in furtherance of a criminal investigation, I request authority to install and use a tracking device or use the tracking capabilities of the property or object described above to determine location. The application is based on the facts set forth on the attached sheet.

☑ The person, property, or object is located in this district.

☐ The person, property, or object is not now located in this district, but will be at the time of execution.

☐ The activity in this district relates to domestic or international terrorism.

☐ Other:

The tracking will likely reveal these bases for the warrant under Fed. R. Crim. P. 41(c): *(check one or more)*

☑ evidence of a crime;

☑ property designed for use, intended for use, or used in committing a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ a person to be arrested or a person who is unlawfully restrained.

☑ I further request, for purposes of installing, maintaining or removing the tracking device, authority to enter the following vehicle or private property, or both:
A Red 2016 Kia Forte, Bearing Ohio License Plate Number JSS2994, VIN # KNAFX4A68G5554896 and 7524 Mt. Whitney, Dayton, Ohio 45424

☑ Delayed notice of _30_ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

CALVIN BURCH
(Affiliate)

Digitally signed by
CALVIN BURCH (Affiliate)
Date: 2023.12.29
11:16:22 -05'00'

*Applicant's signature*

TFO Calvin Burch, DEA

*Applicant's printed name and title*

Sworn to before me and signed in my presence via telephone.

Date: _12/29/23_

City and state:  Dayton, Ohio

Peter B. Silvain, Jr.
United States Magistrate Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF
OHIO
WESTERN DIVISION

IN THE MATTER OF THE TRACKING OF
THE RED 2016 KIA FORTE BEARING OH
LICENSE PLATE NUMBER JSS2994, VIN #
KNAFX4A68G5554896

Case No. ___3:23-MJ-569___

**Filed Under Seal**

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Calvin Burch, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 3117 to authorize the installation and monitoring of a tracking device in/on a red 2016 Red Forte bearing Ohio license plate number JSS2994 and vehicle identification number KNAFX4A68G5554896 ("the **SUBJECT VEHICLE**"). Based on the facts set forth in this affidavit, I believe that the **SUBJECT VEHICLE** is presently being used in furtherance of drug trafficking and conspiracy to commit drug trafficking, in violation of  21 U.S.C. §§ 841 and 846, and that there is probable cause to believe that the installation of a tracking device in/on the **SUBJECT VEHICLE** and use of the tracking device will lead to evidence, fruits, and instrumentalities of the aforementioned crimes as well as to the identification of individuals who are engaged in the commission of those and related crimes.

2. I am a Task Force Officer (TFO) with the United States Drug Enforcement Administration (DEA), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 21, United States Code, Section 878.  I have been employed as a Task Force Officer with the DEA since March

2022 and a Police Officer with the Springfield Police Division since February 2015.  In 2014, I attended the Clark State Community College which consisted of training in conducting basic police operations.  Since then, I have attended many hours of training including, but not limited to, drug trafficking investigations, tactical entry and vehicle arrest operations, criminal interdiction, interview/interrogation, cell phone narcotic investigations, and additional aspects of conducting investigations. Prior to beginning my assignment as a DEA TFO, I was a sworn Law Enforcement Officer of the State of Ohio who was charged with the duty to investigate criminal activity and enforce the criminal laws of the State of Ohio.  I have investigated numerous drug trafficking investigations since 2019, when I began the assignment as a narcotics investigator for the Springfield Police Division.  I continue to be employed as a Springfield Police Officer.

3.      I also have been involved in narcotic related arrests and executed search warrants that resulted in the seizure of narcotics. During my training, I have learned methods by which drug traffickers possess and distribute controlled substances; the manner and means in which they conceal and launder the proceeds from the distribution of controlled substances; the manner and means in which they protect their proceeds and controlled substances; and the manner in which they attempt to avoid law enforcement detection of their activities.

4.      My experience as a Law Enforcement Officer/Detective with the City of Springfield Police Division in Springfield, Ohio, includes but is not limited to: physical surveillance; supervising informants during the purchases of controlled substances; debriefing persons arrested and convicted of drug trafficking offenses about their illegal activity; compiling, organizing, and analyzing precise location information (GPS data) and telephone toll data; interviewing witnesses; drafting search warrants; seeking seizure of illegal drugs and other evidence of drug violations; searching locations and seizing narcotics, "tools of trade,"

documents, and the monetary gains of narcotics trafficking; assisting Prosecutors in the prosecution of defendants on trial for state drug violations; and, testifying as a witness concerning the violations of State of Ohio drug laws.

5. I have participated in the preparation of affidavits in support of numerous search and arrest warrants for violations of State of Ohio criminal laws, as well as in the execution of the same. In addition, I have on numerous occasions seized contraband, conveyances, currency, drug paraphernalia, and firearms possessed or used in relation to violations of State of Ohio criminal laws.

6. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

7. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. §§ 841 and 846 have been committed, are being committed, and will be committed by Adrian WHITE and others. There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations and will lead to the identification of individuals who are engaged in the commission of these offenses.

8. The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

3

<u>**PROBABLE CAUSE**</u>

**A. Overview of the Investigation and the Subject Vehicle**

9.    The United States, including the Drug Enforcement Administration, is conducting a criminal investigation into Adrian WHITE, Sonequa MCGRAW, who operates a 2016 red Kia Forte, bearing the Ohio license plate: JSS2994 & VIN: KNAFX4A68G5554896 **(SUBJECT VEHICLE)** and others regarding possible violations of 21 U.S.C. §§ 841(a)(1) (possession with the intent to distribute controlled substances), 843(b) (use of a communication facility to commit a felony), and 846 (conspiracy to possess with the intent to distribute controlled substances).

10.    On August 16, 2023, I spoke with Clark County, Ohio K9 Deputy Weaver and Deputy Payne in reference to an ongoing methamphetamine trafficking organization. During this conversation, the deputies mentioned that they have conducted several traffic stops leaving known drug houses within the Clark County, Ohio area and have seized methamphetamine and firearms from many of these traffic stops.

11.    During one of the encounters, the deputies mentioned that they formed a confidential source[1] (hereafter CS), who they seized a large amount of methamphetamine and pills from. Through this investigation, Clark County Deputy Durham was in contact with this CS and the CS provided him with the phone number 937-270-6552 (hereinafter 6552) and a photo of an unknown male. The CS explained to Deputy Durham that they contacted the 6552 number in order to organize and schedule the purchased/pickup of large amounts of methamphetamine two

_____

[1] CS has provided information to law enforcement for judicial consideration for pending crimes. CS has never provided materially false information to law enforcement and their information has led to the seizure of illegal narcotic. Investigators have independently corroborated CS information; therefore, Clark County Deputies believe that the CS is a trustworthy and reliable source of information.

to three times a week. The CS also told Deputy Durham that they would travel to 717 Crestmore Avenue, Dayton, Ohio to purchase the methamphetamine that they coordinated with the 6552 number.

12.     Later this same day, I completed an administrative subpoena for the AT&T 6552 number requesting call detail records and subscriber information. AT&T responded with their finding and noted that the subscriber was listed as "prepaid customer".

13.     Based on my training and experience, I know that it is common for drug traffickers to often have "burner phones" or prepaid phones to thwart law enforcement from learning the true holder of a cell phone number.

14.     On August 17, 2023, Deputy Payne provided me with a copy of the extraction that was completed on the CS' cell phone. An extraction report is a report that is created after a cell phone is downloaded. This extraction was obtained via search warrant authorized by the Clark County, Ohio Common Pleas Court Judge Driscoll on August 7, 2023. Within this extraction, I located the phone number 6552 labeled as "Rays Boy"[2]. The following are a few examples of text message conversations between the CS and the 6552 number:

On July 19, 2023

**CS:** Pulling up

6552**:** OK

**CS:** Got 1250

_____

[2] At this time, it is not understood why the CS labeled the person possessing the 6552 number as "Rays Boy".

5

On July 26, 2023

> **CS:** Got 850 u do half
>
> **6552:** Ok I'm waiting for you

On August 2, 2023

> **CS:** Cool to come that way
>
> **6552:** What u needed
>
> **CS:** Halfway
>
> **6552:** What u got
>
> **CS:** 850
>
> **6552:** OK come on
>
> **CS:** About to be there turning on the Hoover

15.     Based on the above conversation, I believe that the CS is organizing a half or half pound of methamphetamine for $850 dollars. I also believe that the CS was traveling to 717 Crestmore Avenue, Dayton, Ohio, based on the text "about to be there turning on the hoover". I am familiar that "Hoover Street" is just south of 717 Crestmore Avenue.

16.     On August 21, 2023, at approximately 4:45 a.m., Dayton Resident Office Task Force Officers Williams Sanders, Thomas Potter, and I conducted a trash pull of 717 Crestmore Avenue. The trash can was placed on the city-owned portion of the alley southeast of the residence. TFO's Sanders and Potter collected one black trash bag and one white trash bag from the receptacle. A short time later, a search of the contents of the bags was conducted which yielded the recovery of a plastic pill bottle with the name "Adrian WHITE", a receipt with the name "Chrissy WILSON" with the phone number 937-204-8455, and approximately 22 vacuum sealed bags/plastic bags that appeared to have all been washed out with water.

17.     Utilizing law enforcement databases, I located a photograph of Adrian WHITE. The person in the law enforcement photo appears to match individual that the CS provided as their source of supply of methamphetamine. I believe WHITE is possessing the 6552 number because of the receipt from the trash pull with "Chrissy Wilson" and phone "937-204-8455 on it, which is the top caller for the 6552 number. As such, I believe CS is credible because I have been able to corroborate their assertions.

18.     Based on my training and experience, I am aware that large scale drug traffickers often received their drugs within vacuumed sealed bags/plastic zip lock bags and when they are thrown away, drug traffickers at times wash any leftover substances with water in order to impede or avoid law enforcement from detecting the original substance within the bags. Therefore, I believe that 717 Crestmore Avenue is being utilized as a stash house or commonly known as storage residence for narcotics.

19.     On August 23, 2023, members of the DEA Dayton Resident Office were conducting surveillance at 717 Crestmore Avenue after receiving information from an Indiana DEA office that their target was potentially coming to Dayton, Ohio. During the course of this investigation into WHITE, I have learn that WHITE's 6552 is in contact with the Indiana target.

20.     At approximately 10:20 am, Task Force Officer Justin Allender observed a red Kia Forte bearing the Ohio license plate: JSS2994 (**SUBJECT VEHICLE**) in front of 721 Crestmore Avenue, Dayton, Ohio. During this surveillance the **SUBJECT VEHICLE** was learned to be registered to a Sonequa MCGRAW.

21.     At approximately 10:38 am, TFO Allender then observed Indiana's target vehicle park to the south of 717 Crestmore Avenue in the alley way. Shortly after, TFO Allender observed MCGRAW exit 721 Crestmore Avenue with a blue shoebox, enter the driver's seat of

the **SUBJECT VEHICLE** and then drive to the same alley way that the Indiana's target vehicle was.

22.     A few moments later, MCGRAW backed out of the alleyway in the **SUBJECT VEHICLE**, park in front of 721 Crestmore Avenue, and then went back inside without a blue shoebox. At the same time, the Indiana target vehicle also departed the alleyway and drove to a fast food restaurant nearby. Once Indiana's target vehicle was at the fast food restaurant, the driver exited with a similar blue shoebox that was observed by TFO Allender and got into a different vehicle, the departed the Dayton, Ohio area.

23.     Later on August 23, 2023, United States Magistrate Judge Ovington authorized a phone ping for Adrian WHITE'S phone number: 937-270-6552[3].

24.     On September 3, 2023, at approximately 12:03 pm., a DPD officer conducted a spot check at 717 Crestmore Avenue and observed WHITE exiting the residence and then shortly after departing in the 2014 Chevrolet Impala. During this observation, WHITE's phone was pinging in the area of 717 Crestmore Avenue and the next phone ping was showing in a different area, indicating that the phone was most likely traveling with WHITE.

25.     On September 4, 2023, at approximately 7:35 am., TFO Sanders, Potter and I conducted surveillance at 38 Whispering Drive, which is believed to be the residence that WHITE is residing. Upon my arrival, I observed the 2014 Chevrolet Impala parked in the driveway. Also, WHITE's phone was pinging at this residence.

26.     At approximately 9:20 am, I observed the 2014 Chevrolet Impala depart from 38 Whispering Drive. Shortly after, TFO Sanders began to follow the 2014 Chevrolet Impala and

---

[3] *See* Southern District of Ohio Case No. 3:23-mj-356.

observed WHITE being the driver and only individual in the 2014 Chevrolet Impala. Investigators ultimately followed this vehicle to 3179 Valerie Arms Drive.

27.     I learned through this investigation that 3179 Valerie Arms Drive, Dayton, Ohio Unit 14 is owned by Aye White Investments LLC since December 19, 2022. Through an open-source search of Aye White Investments LLC, Adrian WHITE is the owner agent of this business. Therefore, I believe that when WHITE comes to 3179 Valerie Arms Drive, he is specifically entering Unit 14.

28.     I would also learn throughout this investigation that WHITE utilized the AT&T phone number 937-231-9476 as his number on his Ohio Bureau of Motor Vehicles application on August 28, 2023.

29.     Upon identifying this phone number, I submitted a subpoena to AT&T, who would response with the requested information. Based on the information provided, the fourth top caller is the AT&T number 330-680-1335 (hereinafter 1335) and based on law enforcement databases this number belongs to Sonequa MCRGAW, a co-conspirator in this investigation.

30.     I would later submit a subpoena to AT&T for call detail records and subscriber information in reference to the 1335. Upon reviewing the requested information the subscriber information stated that "Sonequa L. McGraw" at 6035 Chambersburg Road, Dayton, Ohio 45424.

31.     On September 8, 2023, at approximately 10:31 am, I utilized electronic surveillance and observed the 2014 Chevrolet Impala parked in front of 721 Crestmore Avenue. Approximately three (3) minutes later, I observed WHITE exit 721 Crestmore Avenue, with another unknown male. Both individuals then walked to the south entrance to 717 Crestmore Avenue. Once WHITE got to the side door of 717 Crestmore Avenue, he used a key to unlock

the door and he and the male went inside. While WHITE was unlocking the door, I observed WHITE wearing a blue latex glove, like the ones pulled from the trash at this same residence on August 21, 2023.

32.     Based on the above information with WHITE exiting 721 Crestmore Avenue and then utilizing a key to enter 717 Crestmore Avenue, I believe WHITE also has access to both residences. In reviewing the Montgomery County, Ohio Auditor's records, 721 Crestmore Avenue was purchased by AWE WHITE LLC on or around April 4, 2022. According to the Ohio Secretary of State business directory, AWE WHITE LLC's statutory agent is Adrian White. In reviewing the Montgomery County, Ohio Auditor's records, 717 Crestmore Avenue was purchased by Darnell Jackson on or around June 12, 2020. Based on call detail records, the 6552 number is in communication with 937-610-8342, which per law enforcement databases is registered to Darnell Jackson. I believe that since WHITE left 721 Crestmore Avenue with a blue latex glove on, that he may hold drug paraphernalia at this residence and was then going to 717 Crestmore Avenue in order to process drugs.

33.     At approximately 10:55 am., WHITE and the unknown male exited 717 Crestmore Avenue. WHITE walked toward a grey Dodge Charger, similar to the grey Charger, bearing the Ohio license plate JZW8667 and departed the area. Based on the 6552 phone ping, WHITE traveled away when the Charger did.

34.     At approximately 3:21 pm., WHITE returned to 721 Crestmore Avenue as a passenger in the grey Dodge Charger, which was confirmed by the 6552 phone ping. Approximately one (1) hour later a Dodge Durango arrived in front of 717 Crestmore Avenue and WHITE exited 721 Crestmore Avenue and got into the passenger's seat of the Durango.

10

Seven (7) minutes later, WHITE exited the Durango, went back inside 717 Crestmore Avenue, and the Durango departed.

35. Based on this observation, with the short meet, in a known drug area, at a known drug house, I believe a drug transaction may have occurred between WHITE and the driver of the Durango.

36. On September 9, 2023, at approximately 8:00 am, WHITE's phone was pinging in the area of 721 Crestmore Avenue. I then observed via electronic surveillance WHITE exiting 721 Crestmore Avenue empty handed and getting into the 2014 Chevrolet Impala and departing. Approximately 18 minutes later, WHITE returned in the 2014 Chevrolet Impala with a book bag and went into 721 Crestmore Avenue.

37. At approximately 8:26 am, WHITE exited 721 Crestmore Avenue again without any backpacks and got into the 2014 Chevrolet Impala and departed. Approximately ten (10) minutes later, WHITE returned in the 2014 Chevrolet Impala with a brown bag and went into 721 Crestmore Avenue.

38. Based on the above information, I believe that WHITE was likely taking the 2014 Chevrolet Impala in order to make a run in order to pick up money or drugs to store them in 721 Crestmore Avenue.

39. On September 11, 2023, at approximately 4:00 am, TFOs Sanders, Potter, Allender and I conducted a trash pull at 717 Crestmore Avenue.  The trash was placed on the city-owned portion of the alley. A search of the contents within the bags yielded multiple plastic bags with white powdery residue, a blue bowl with white powdery residue, methysulfonymethane powder container with multiple plastic bags inside, two bags with white/blue powder and multiple shotgun shells.

11

40.     Based on my training, knowledge and experience, in the drug trafficking world white powdery residue is usually left behind on items after utilizing them to make/cut/or packaging illegal narcotics. I am also aware that methylsulfonymethane is commonly utilized by drug dealers to cut or mix with illegal narcotics in order to double a drug dealer's product. I also know that drugs dealers often are in possession of firearms and ammunition.

41.     The two bags of powder suspected to be narcotics were submitted to the lab for further testing. I received reports from the lab indicating that one bag contained Methamphetamine, Xylazine, and Dimethyl Sulfone. The second bag contained cocaine.

42.     Based on this trash pull, I continue to believe that 717 Crestmore Avenue is a stash house and now also a drug processing house, due to the methylsulfonymethane, a "cutting" agent and packaging items.

43.     On September 21, 2023, at approximately 1:03 pm., I conducted surveillance at 3179 Valerie Arms Drive and Special Agent (SA) Hobbs was conducting surveillance at 717 Crestmore Avenue. During this time, WHITE's phone was pinging in the Valerie Arms Drive area, which is a known location for WHITE. Present at 3179 Valerie Arms Drive was the 2014 Chevrolet Impala and a grey Dodge Charger bearing Ohio license plate JZW8667.

44.     At approximately 1:24 pm, I observed the grey Dodge Charger depart 3179 Valerie Arms Drive and arrive at 717 Crestmore Avenue at approximately 1:32 pm. WHITE's phone pinged from the Valerie Arms Drive area to the 717 Crestmore Avenue area which leads me to believe WHITE was in the Dodge Charger.

45.     At approximately 1:44 pm., the Dodge Charger pulled into the alleyway south of 717 Crestmore Avenue and met with a Ford F-150. Investigators then followed the Ford F-150, who met up with a white Honda Accord and a black Kia sedan nearby. Once these three

vehicles met, SA Roseberry observed the Ford F-150 provide something to the white Honda Accord and these three vehicles then left in tandem.

46.     During this surveillance, investigators followed these three vehicles as they made their way to Indiana. Investigators also observed that two out of three of these vehicles had Indiana license plate. With this information, Dayton DEA investigators were in contact with Indiana DEA who followed these vehicles to Indiana and ultimately conducted a traffic stop on the white Honda Accord. During this traffic stop, law enforcement seized approximately ten (10) pounds of methamphetamine and a firearm. It is my belief that the Dodge Charger, which WHITE was suspected of being in, provide narcotics to the Ford F-150, which in turn provided the same to the white Honda Accord.

47.     The driver of the Ford F-150 who received the narcotics in the alleyway of Crestmore Avenue, is also the same individual that MCGRAW met on August 23, 2023, while passing a blue shoebox in the **SUBJECT VEHICLE**.

48.     Based on my training an experience, it is common for large scale drug traffickers to travel long distance, like from Indiana to Dayton, Ohio and bring a courier with them in order to insulate themselves from the drugs in case they are stopped by law enforcement.

49.     On September 22, 2023, at approximately 11:37 pm, the phone ping for the 6552 number ended.

50.     On October 3, 2023, TFOs Sanders, Potter, Allender and I conducted a trash pull of 717 Crestmore Avenue. The trash can was placed on the city-owned portion of the alley southeast of the residence. TFO's Sanders and Potter collected several trash bags from the receptacle. A short time later, a search of the contents of the bags was conducted which yielded

the recovery of multiple plastic bags with white powder residue, a container for Fiber Powder, with plastic gloves within the container.

51.     On October 16, 2023, at approximately 1:00 pm, I began surveillance at 717 Crestmore Avenue, Dayton, Ohio. At approximately 1:11 pm, I observed a silver Infinity, bearing the Ohio license plate: KDT9292 arrive at 717 Crestmore Avenue and park to the south of the residence. Moments later a black male in a red shirt, grey hooded sweatshirt and dark colored pants, utilized a key to unlocked and walk into the front door of this residence.

52.     At approximately 1:18 pm, I observed the same individual exit the front door of 717 Crestmore Avenue, walk back towards the Infinity and then the Infinity departed.

53.     During this surveillance, I learned that the Ohio license plate: KDT9292 is registered to William Bates, who utilizes the phone number: 937-998-9056. I reviewed call detail records for the 6552 number and identified the 9056 number to be in frequent contact with the 6552 number.

54.     At approximately 2:20 pm, TFO Sanders and I began surveillance at 3179 Valerie Arms Drive, Dayton, Ohio. At approximately 2:49 pm, I observed the previously mentioned silver Infinity arrive in front of 3179 Valerie Arms Drive and shortly after Adrian WHITE exited the passenger's seat. WHITE then walked into the front door of 3179 Valerie Arms Drive.  At approximately 2:51 pm, I observed WHITE exit 3179 Valerie Arms Drive and get back into the passenger's seat of the silver Infinity.

55.     TFO Sanders and I then followed the Infinity, without losing sight to 1315 Alcott Avenue, Dayton, Ohio. At approximately 2:59 pm, TFO Sanders observed the silver Infinity pull into the driveway of 1315 Alcott Avenue, where a black male from a black Dodge minivan appeared to be waiting. TFO Sanders observed this unknown male approach WHITE in the

14

Infinity and conduct a hand-to-hand transaction. TFO Sanders then observed the Infinity and the Dodge minivan depart in opposite directions immediately after the transaction.

56.     With the short stay at Valerie Arms Drive, I believe that WHITE obtained narcotics and transported them in the Infinity to 1315 Alcott Avenue.

57.     On October 24, 2023, at approximately 12:44 pm, I conducted a spot check at 3179 Valerie Arms Drive and observed the **SUBJECT VEHICLE** parked out front. At approximately 12:56 pm, I then observed the **SUBJECT VEHICLE** depart and ultimately travel to 2800 Philadelphia Drive, Dayton, Ohio this is the business of "Everyday Gas Station". While the vehicle was stopped, I observed the driver to be Sonequa MCGRAW and WHITE to be the passenger.

58.     On October 25, 2023, the Honorable Judge Peter Silvain, Jr., authorized a phone ping for WHITE 6552 phone number and a pen register/trap and trace[4].

59.     On October 27, 2023, at approximately 1:46 pm, I conducted surveillance at 3179 Valerie Arms Drive, during this time, WHITE's phone was pinging in the area. Upon my arrival, I observed the **SUBJECT VEHICLE** departing the area with WHITE being the passenger. At approximately 2:10 pm, the **SUBJECT VEHICLE** returned and WHITE exited the passenger's seat and walked into 3179 Valerie Arms Drive, the **SUBJECT VEHICLE** then departed.

60.     At approximately 2:12 pm, a silver Infinity bearing the Ohio license plate: KDT9292 arrived and the driver, identified as William BATES exited the vehicle and walked into 3179 Valerie Arms Drive. About five (5) minutes later, BATES exited the apartment complex and departed in his vehicle.

---

[4] *See* Southern District of Ohio Case No. 3:23-mj-452.

61.     At approximately 2:26 pm, MCRGAW returned in the **SUBJECT VEHICLE** and entered 3179 Valerie Arms Drive.

62.     At approximately 2:36 pm, BATES returned in his silver infinity and also entered 3179 Valerie Arms Drive.

63.     At approximately 2:48 pm, BATES, MCGRAW and WHITE exited 3179 Valerie Arms Drive. BATES then departed in his Infinity and MCGRAW and WHITE departed in the **SUBJECT VEHICLE**, northbound on Philadelphia Drive. WHITE phone also pinged north indicting that WHITE was traveling with the **SUBJECT VEHICLE.**

64.     Based on the above activity, with BATES and MCGRAW consistently leaving and returning, I believe that they were potentially running narcotics to unknown locations for WHITE, specifically MCGRAW utilizing the **SUBJECT VEHICLE.**

65.     On Thursday, November 2, 2023, at approximately 9:09 am, utilizing electronic surveillance, I observed a Chevrolet Silverado arrive and park in alleyway to the south of 717 Crestmore Avenue. Shortly after this vehicle arrived, I observed an individual wearing blue Hooded sweatshirt and black sweatpants, matching the description of WHITE enter the south door to 717 Crestmore Avenue during this same time, WHITE's phone was pinging in the area.

66.     At approximately 9:13 am & 9:24 am, WHITE's 6552 phone was pinging in the area of 717 Crestmore Avenue still. At approximately 9:33 am, utilizing electronic surveillance the **SUBJECT VEHICLE** arrived at 717 Crestmore Avenue and the driver, believed to be MCGRAW, walked to the south side door and entered the residence. Approximately 3 minutes later, MCGRAW and WHITE exited the residence and departed in tandem in their respective vehicles.

16

67.     On November 3, 2023, at approximately 1:49 pm, I was conducting surveillance at 3179 Valerie Arms Drive and observed WHITE enter the driver's seat of the **SUBJECT VEHICLE** with a black grocery like bag. About 30 minutes later, WHITE would return in the **SUBJECT VEHICLE** without the bag and enter 3179 Valerie Arms Drive.

68.     With the observation of WHITE driving the **SUBJECT VEHICLE**, I believe that WHITE and MCGRAW are close to the point she allows WHITE to utilize her vehicle (**SUBJECT VEHICLE**). I also believe that WHITE transported narcotics from his residence, to an unknown location, utilizing the **SUBJECT VEHICLE.**

69.     On November 6, 2023, at approximately 4:45 a.m., TFOs Sanders, Starkey, Springfield Police Detective Adams and I conducted a trash pull at 717 Crestmore Avenue, Dayton, Ohio 45402. The trash can was placed on the city-owned portion of the alley southeast of the residence. TFO Sanders and I collected several trash bags from the receptacle.

70.     A short time later, I searched the contents of the bags and yielded the recovery blue rubber gloves and multiple kilo wrappers, containing dryer sheets and coffee grounds. TFO Sanders observed this search.

71.     Based on my training and experience, I am aware that narcotics being trafficking usually wrapped with dryer sheets and coffee grounds in order to assist in avoiding law enforcement canines.

72.     On November 16, 2023, at approximately 9:00 am, TFOs Allender, Sanders, and I conducted surveillance on Adrian WHITE at 3179 Valerie Arms Drive, Dayton, Ohio. Upon arrival, noted that WHITE's 6552 phone was pinging in this location.

73.     At approximately 9:58 am, I observed a Chevrolet Impala bearing the Ohio temporary license plate: R267773 arrive at 3179 Valerie Arms Drive and park in the front. After

17

parking, I observed William BATES exit the Impala and proceed to enter the front door of 3179 Valerie Arms Drive. I am able to identify BATES from a distance due to many hours watching BATES and looking at photos of him.

74.     About ten (10) minutes later, BATES exited the front door of the apartment complex and departed in the Impala. While on surveillance, I learned that the Ohio temporary license plate R267773 is registered to William BATES.

75.     At approximately 10:15 am, I observed the **SUBJECT VEHICLE** park in front of the apartment complex. Moments later, Sonequa MCGRAW exited the **SUBJECT VEHICLE**; at the same time a Dodge Caravan bearing the Ohio temporary license plate: R480257 appeared from the rear of the 3179 Valerie Arms Drive and stopped to talk to MCGRAW. While MCGRAW was talking to the driver of the Dodge Caravan, TFO Allender drove by the two and identified WHITE to be the driver and sole occupant in the Dodge Caravan.

76.     Since investigating this Drug Trafficking Organization (DTO), I am already aware that Sonequa MCGRAW is the registered owner of the **SUBJECT VEHICLE** and am also able to identify her from a distance from the hours of surveillance. While on surveillance, I learned that the Dodge Caravan is registered to Adrian WHITE and purchased on October 31, 2023, for $6,000.

77.     At approximately 10:22 am, I observed MCGRAW getting into the **SUBJECT VEHICLE** and depart westbound on Valerie Arms Drive; at the same time, WHITE departed eastbound and ultimately traveled to the Northwest Plaza at 2901 Philadelphia Drive, Dayton. WHITE stopped at a health store and then shortly after returned 3179 Valerie Arms and parked behind the apartment complex.

78.     At approximately 10:43 am, TFO Sanders observed BATES park in front of 3179 Valerie Arms Drive in the Chevrolet Impala that was previously mentioned and walk into the front door of the apartment complex, empty handed.

79.     At approximately 10:51 am, TFO Sanders observed MCGRAW arrive in the **SUBJECT VEHICLE**, park in the front, and then walk into the apartment complex with a clear tote.

80.     At approximately 11:05 am, TFO Sanders observed BATES exit 3179 Valerie Arms Drive with a black shoebox and placed it within his Chevrolet Impala on the passenger's side. TFO Sanders then observed BATES get into the driver's seat of the Chevrolet Impala and depart westbound. TFOs Allender, Sanders, and I then followed BATES. BATES ultimately made his way to I-70 west towards Indiana.

81.     Based on the investigation into this DTO, they have connections to Indiana and supply individuals from Indiana with multiple pounds of methamphetamine. Oftentimes, they use shoeboxes to transport these narcotics. Based on the actions observed at 3179 Valerie Arms Drive and the fact that BATES was now traveling in the direction of Indiana, investigators believed BATES was transporting narcotics.

82.     At approximately 11:53 am, TFO Burch was able to contact Ohio State Highway Patrol Trooper Pohlabel in reference to the ongoing investigation. At approximately 11:59 am, Trooper Pohlabel was able to conduct a traffic stop on the 2014 Chevrolet Impala for following too closely on a commercial tractor trailer combination. The suspect vehicle was approximately 2- 2 ½ vehicle lengths behind the commercial unit at a speed of 70 mph.

83.     During the course of this traffic stop, Trooper Pohlabel made contact with the driver who was identified as William BATES. Trooper Pohlabel ultimately utilized his canine,

K9 Sahra, in order to conduct a free air sniff around the exterior of the vehicle. K9 Sahra is a certified narcotics detection canine. The canine indicated to the presence of narcotics, which then led to a search of BATES' vehicle.

84.     While searching the vehicle, Trooper Pohlabel located a black shoebox on the rear passenger side floorboard of the vehicle. Within this shoebox, Trooper Pohlabel observed seven (7) ziplock baggies of containing a crystal rocklike substance, suspected of being methamphetamine.

85.     Based on the surveillance and traffic stop, I believe that MCGRAW utilized the **SUBJECT VEHICLE** in order to go to an unknown location, pick up the seven (7) pounds of suspected methamphetamine, in order to provide it to WHITE and BATES.

86.     On November 30, 2023, Magistrate Judge Gentry authorized a- tracking warrant for **SUBJECT VEHICLE**. [5] Due to the inability to locate subject vehicle at a time that was safe for law enforcement officers to install the tracking device, the warrant was not executed. Since the time of authorization to install a tracking device on **SUBJECT VEHICLE**, I believe the subject vehicle is still being used in furtherance of the drug trafficking conspiracy.

87.     For example, on December 7, 2023, a deputy with the Clark County Sheriff's Office conducted a traffic stop on a co-conspirator of WHITE's for a marked lanes violation and a window tint violation. The co-conspirator was removed from the vehicle in order for a drug detecting canine to be deployed. An officer conducted a *Terry* pat down of the co-conspirator for weapons and while doing that observed a plastic baggie hanging out of the jeans near the co-conspirator's stomach. Based upon the law enforcement officer's training and experience, they

---

[5] See Southern District of Ohio Case No. 3:23-mj-00510.

believed that the baggie was an attempt by the co-conspirator to conceal suspected narcotics. Law enforcement retrieved that baggie, which revealed 118 grams of suspected methamphetamine.

88.     I then interviewed the co-conspirator. Post-*Miranda*, the co-conspirator admitted to contacting 937-789-0629 in order to set up the purchase of the suspected methamphetamine. The co-conspirator then stated that they met a black male and black female in a smaller red Kia sedan in order to pick up the suspected methamphetamine. Based on this investigation, I am aware that Sonequa MCGRAW operates a red Kia Forte (**SUBJECT VEHICLE)** and she is a black female and oftentimes she associates with WHITE, who is a black male. I then researched the phone number 937-789-0629 and identified this number to be in contact with other phone targets of the DTO. Based on all these facts, I believe that WHITE and MCGRAW supplied the suspected methamphetamine on December 7, 2023, within the **SUBJECT VEHICLE**.

89.     On December 11, 2023, I submitted a subpoena to AT&T for 1335 call detail records and identified that 1335 is still currently active and being utilized.

90.     On December 19, 2023, Magistrate Judge Silvain, authorized a phone ping for MCGRAW's 1335 phone number[6].

91.     Since receiving phone pings for MCGRAW's phone, it has placed her and the **SUBJECT VEHICLE** at WHITE's residence of 3179 Valerie Arms Drive and at 7524 Mt Whitney, Dayton, Ohio 45424. Specifically, on December 27, 2023, I conducted surveillance at

---

[6] *See* Southern District of Ohio Case No. 3:23-mj-552.

7524 Mt. Whitney and observed the **SUBJECT VEHICLE** parked in the parking lot at approximately 8:30 am. At this same time, MCGRAW's phone was also pinging in this area.

92.     WHITE also has a criminal history of Forgery (case no. 2003CR03998-1), Possession of Drugs (case no. 2007CR00787), Possession of Heroin (case no. 2009CR02613), Possession of Cocaine (case no. 2011CR2647) all out of the Montgomery County, Ohio Common Pleas Court. Also Trafficking in Heroin and Possession of Cocaine (case no. 13CR29235) out of Warren County, Ohio Common Pleas Court.

93.     For all the foregoing reasons, I believe that WHITE and MCGRAW are using the **SUBJECT VEHICLE**, in furtherance of their drug trafficking activities. I believe that tracking the location of the **SUBJECT VEHICLE** will lead to additional evidence of WHITE, MCGRAW, and co-conspirators, including, but not limited to, the identities and locations of sources of supply and coconspirators; locations of stash houses used to store drugs, drug proceeds, firearms, and other drug trafficking paraphernalia; and patterns of activity and methods of operation of WHITE and those associated with him.

94.     Based on my observation and the observations of fellow law enforcement officers, I know that the **SUBJECT VEHICLE** is presently within the Southern District of Ohio.

95.     In order to track the movement of the **SUBJECT VEHICLE** effectively and to decrease the chance of detection, I seek authorization to place a tracking device in/on the **SUBJECT VEHICLE** while it is in the Southern District of Ohio. Because MCGRAW sometimes parks the **SUBJECT VEHICLE** in driveways and on other private property, it may be necessary to enter onto private property and/or move the **SUBJECT VEHICLE** to effect the installation, repair, replacement, and removal of the tracking device. As I described above, law

22

enforcement has observed the SUBJECT VEHICLE parked at, 7524 Mt. Whitney, Dayton, Ohio 45424.

96.     In the event the Court grants this application, there will be periodic monitoring of the tracking device during both daytime and nighttime hours for a period not to exceed 45 days following issuance of the warrant.  The tracking device may produce signals from inside private garages or other such locations not open to the public or visual surveillance.

## BACKGROUND ON DRUG TRAFFICKERS

97.     Based on my training and experience, as well as my discussions with other law enforcement agents, I know the following:

a)     Drug dealers often maintain documents pertaining to the possession, importation, exportation, and/or distribution of controlled substances and illegal proceeds, including invoices, shipping labels, tracking numbers, boxes, and envelopes at their residences, stash houses, and/or in their vehicles where they are available for reference and concealed from law enforcement, and it is common to find photos or other records relating to these items on any electronic device used by the drug dealer;

b)     It is also common to find on drug dealers' smart phones, cell phones, and/or other electronic devices, as well as at physical locations such as drug dealers' residences and vehicles, evidence relating to the following common practices of drug dealers:

i.     Drug dealers commonly store drugs and drug paraphernalia, including pipes, syringes, and rolling papers, in their residences, stash houses, and/or vehicles in order to have ready access to the drugs and/or paraphernalia in order to conduct their drug dealing business or to use those drugs personally;

ii.     Drug dealers attempt to mask the distinct odors of particular drugs through

23

the use of heat sealing and/or canning devices and/or aromatic substances such as laundry soap, dryer sheets, air fresheners, or axle grease;

iii.   Drug dealers often dilute, or "cut," drugs in order to maximize the volume of drugs they have to sell, and thus their profits. Drug dealers use various substances to dilute drugs, including mannitol, mannite, lactose, Vitamin B12, and MSM. Drug dealers use equipment, such as scales, sifters, hammers, grinders, razor blades, glass panes, mirrors and kilo or pound presses as part of the dilution or "cutting" process. Once the drug has been "cut," drug dealers usually will repackage it, often in smaller quantities, using masking agents, tape, heat sealers and heat sealed bags, ziplocs bags, paper bindles, and/or other containers for redistribution. It is common for drug dealers to maintain such equipment and supplies in their residences and stash houses;

iv.   Drug dealers keep books, receipts, notes, ledgers and other forms of records specifically relating to their drug distribution activities. Because drug dealers often "front" drugs to their customers – that is, sell the drugs on credit – or receive drugs from their suppliers on credit, such documentation is necessary to keep track of the amounts paid and owed with respect to their customers and suppliers. These ledgers are more commonly known as "pay/owe sheets" and may be as simple as notations on miscellaneous pieces of paper or may be recorded more formally in notebooks or even computer spreadsheets, and are frequently encoded in order to protect those involved. Drug dealers often keep such records on their person or in their residences, stash houses, and/or vehicles;

v.   Drug dealing is a cash business. Customers pay for drugs with cash and dealers commonly purchase drugs from their suppliers with cash. Drug dealers commonly keep large sums of currency, financial instruments, precious metals, jewelry, and other items of value which represent either the proceeds from drug sales or are intended for the purchase of controlled substances. When drug dealers amass such wealth, they often attempt to legitimize that wealth or otherwise conceal it and its origin from discovery by law enforcement. To accomplish this, drug dealers often use different techniques, including the use of foreign and domestic banks and their attendant services, including savings and checking accounts, securities, cashier's checks, money drafts and letters of credit to exchange drug proceeds into money that appears to come from a legitimate source. Drug dealers also purchase real estate or vehicles, and establish shell corporations and business fronts that they use to launder drug proceeds. Drug dealers often utilize fictitious or "straw-holder" owners to conceal

24

the true ownership, vehicles, or other valuable items purchased with the proceeds of illicit drug sales. In addition, drug dealers often use wire transfers, cashier's checks, and money orders to pay for drugs or other costs relating to their distribution business. Drug dealers often keep these items of value, and records relating to them, on their person or in their residences, stash houses, and/or vehicles where they are concealed from law enforcement and readily available.

vi.    Drug dealers go to great lengths to hide and secure the drugs, drug proceeds, other items of value and records relating to their drug business. This is to safeguard those items against robbery and keep them from law enforcement. These secure locations typically include safes, vaults, or other locked containers, as well as specially constructed concealed compartments such as those often found in vehicles used specifically to facilitate drug dealing. Other methods of concealment include the burial of such items underground, the use of locked vehicles, trailers, out buildings, sheds, and/or exterior closets, the use of natural spaces within walls, furniture, vehicles, and other areas, and the use of sealed cans and canning machines;

vii.    Drug dealers often use the United States Postal Service or commercial express mail delivery companies, such as FedEx or UPS, to ship drugs and money to various points within the United States. They do so, at least in part, due to the convenience of the service and the availability of related internet and phone tracking services, speed of delivery, and to reduce their risk of arrest during the transportation of drugs from one place to another. They often use hand-written airbills, drop the packages near closing time, pay for such services in cash and utilize false or nominee names, addresses, and/or telephone numbers when using such services in order to further insulate themselves from detection by law enforcement. Drug dealers frequently maintain records relating to their use of these services, such as receipts, copies of airbills, empty and/or previously used boxes, packing tape, packing popcorn/filler and other packaging materials, and package tracking records printed from the internet, at their residences, stash houses, and/or in their vehicles where they are available for reference.

viii.    Drug dealing is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package and deliver the drugs and persons to launder the drug proceeds. These persons frequently maintain listings of names, aliases, telephone numbers, pager numbers, facsimile numbers, physical

addresses, and email addresses, sometimes encoded and sometimes not encoded, for the purpose of contacting their suppliers, customers, transporters, and others involved in their illicit drug distribution activities. These records are typically maintained on their person or in their residences, stash houses, and/or vehicles, so they are readily available in order to efficiently conduct their drug dealing business. Moreover, such records are often stored electronically within the memory of telephones, computers, and/or personal digital assistants such as iPhone and Blackberry devices;

ix.     Drug dealers often use cellular telephones, satellite telephones, pagers and text messaging devices, voicemail or answering machine systems, telephone calling cards, computers, email, and/or personal digital assistants such as iPhone and Blackberry devices in order to communicate with their suppliers, customers, transporters, and others involved in their illicit drug distribution activities. Drug dealers often keep these items on their person or in their residences, stash houses, businesses, and/or vehicles where they are readily available;

x.      Drug dealers often travel by car, bus, train, or airplane, both domestically and to and/or within foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, or to transport drugs or drug proceeds. Documents relating to such travel, such as calendars, travel itineraries, maps, airline ticket and baggage stubs, frequent use club membership information and records associated with airlines, rental car companies, and/or hotels, airline, hotel and rental car receipts, credit card bills and receipts, photographs, videos, passports, and visas, are often maintained by drug dealers in their residences, stash houses, and/or vehicles where they are readily available for use or reference;

xi.     Drug dealers frequently possess firearms, ammunition, silencers, explosives, incendiary devices, and other dangerous weapons to protect their profits, supply of drugs, and persons from others who might attempt to forcibly take such items and/or harm them during transactions. Such weapons, which are often stolen or otherwise possessed illegally, are typically maintained on their person or in their residences, stash houses, and/or vehicles where they are concealed from law enforcement and readily available;

xii.    Drug dealers frequently take, or cause to be taken, photographs and/or videos of themselves, their criminal associates, their real and personal property, their weapons, and their drugs; and such items are often stored

on their person, in their residences, and/or vehicles;

xiii.   During the course of a search it is not uncommon to find items of personal property that tend to identify the person(s) in residence occupancy, control, or ownership of the place being searched vehicle, such as cancelled mail, deeds, leases, titles, registration information, rental agreements, photographs, videos, diaries, utility and telephone bills, tax documentation, travel documents, statements, passports, driver's licenses and/or identification cards, immigration documentation, birth certificates, and keys;

xiv.   Drug dealers often utilize two-way radios, police scanners, video surveillance systems, and other counter surveillance equipment to prevent detection by law enforcement, and that such items are typically maintained at their residences, stash houses, and/or in their vehicles; and

xv.   I know that drug dealers often use their vehicles to transport contraband – including drugs, drug proceeds and firearms – and other evidence of their activities.   I know that following a drug trafficker's movements can facilitate surveillance and enable agents to follow a subject without exposing themselves to the subject they are following.   This in turn enables agents to observe a drug trafficker's meetings with other associates and learn about new locations where a DTO stores drugs, money, firearms and other items related to the manufacture and distribution of controlled substances.

## AUTHORIZATION REQUEST

98.   Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 3117, that authorizes members of the Drug Enforcement Administration (DEA) or their authorized representatives, including but not limited to other law enforcement agents and technicians assisting in the above-described investigation, to install a tracking device in/on the SUBJECT VEHICLE within the Southern District of Ohio within 10 days of the issuance of the proposed warrant, to maintain, repair, and/or replace the tracking device as necessary, and to remove the tracking device from the SUBJECT VEHICLE after the use of the tracking device has ended; to install, maintain, and remove the tracking device during both daytime and nighttime hours; to

27

surreptitiously enter 7524 Mt Whitney, Dayton, Ohio 45424 and/or move the SUBJECT VEHICLE to effect the installation, repair, replacement, and removal of the tracking device; and to monitor the tracking device for a period of 45 days following the issuance of the warrant, including when the tracking device is inside private garages and other locations not open to the public or visual surveillance, both within and outside the Southern District of Ohio.

99.     In accordance with 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), I further request that the warrant delay notification of the execution of the warrant for 30 days after the end of the authorized period of tracking (including any extensions thereof) because there is reasonable cause to believe that providing immediate notification may have an adverse result, as defined in 18 U.S.C. § 2705.  Providing immediate notice would seriously jeopardize the ongoing investigation by prematurely revealing its existence and giving suspects an opportunity to flee from prosecution, destroy or tamper with evidence, intimidate potential witnesses, notify confederates, and change patterns of behavior.

100.    I further request that the Court seal the warrant and the affidavit and application in support thereof, except that copies of the warrant in full or redacted form may be maintained by the United States Attorney's Office and may be served on Special Agents and other investigative and law enforcement officers of the DEA, federally deputized state and local law enforcement officers, and other government and contract personnel acting under the supervision of such investigative or law enforcement officers, as necessary to effectuate the warrant.  These documents pertain to and discuss an ongoing criminal investigation that is neither public nor known to all the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize the investigation. Sealing these documents will also better ensure the safety of agents and others.

Respectfully submitted,

CALVIN BURCH
(Affiliate)

Digitally signed by CALVIN BURCH
(Affiliate)
Date: 2023.12.29 11:14:57 -05'00'

Calvin Burch
Task Force Officer
Drug Enforcement Administration

Subscribed and sworn to before me on December __29th__, 2023.

Peter B. Silvain, Jr.
United States Magistrate Judge